[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-15287
_____

D.C. Docket No. 9:16-cr-80135-RLR-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MIKEL CLOTAIRE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 30, 2020)

Before ROSENBAUM, GRANT, and HULL, Circuit Judges.

GRANT, Circuit Judge:

Brothers Mikel and Yvenel Clotaire applied for Florida unemployment

benefits. The problem was that they did so many times, and using many

identities—none of which were their own. In a creative twist, the brothers

leveraged Yvenel's job as a postman to intercept preloaded debit cards that they had requested while posing as residents who lived on Yvenel's route. Though the mailboxes did not have surveillance footage (that we know of), the banks where the brothers used the stolen debit cards did. When the law eventually caught up with the Clotaire brothers, the federal government charged each with conspiracy to commit access device fraud, access device fraud, and aggravated identity theft. 18 U.S.C. §§ 1029(b)(2), 1029(a)(2), 1028A(a)(1). Though tried separately, both were convicted. Mikel Clotaire now appeals on multiple evidentiary grounds, all of which challenge the methods that the government used to prove his identity to the jury. We affirm his convictions.

## I.

In 2014, the Jupiter Police Department got word that one of its officers applied for Florida unemployment benefits. Suspecting that the officer was a victim of identity theft—after all, he was very much employed—the police contacted the state unemployment office, which in turn reached out to the U.S. Department of Labor when it learned that the application was not legitimate. Special Agent Mathew Broadhurst, an investigator with the Labor Department, opened a criminal investigation.

The investigation uncovered an electronic application for benefits with the officer's name, date of birth, driver's license number, and social security number. That was an obvious problem since the officer had not applied. More digging revealed seven more fraudulent applications—each exploiting a different person's

2

identity, but bearing enough similarities to indicate that they were part of a common scheme.

Based on these fraudulent applications, the state unemployment office had mailed debit cards to various addresses in the 33418 zip code. As it turns out, Yvenel, a postman with the U.S. Postal Service, covered this area on his route and snatched the fraudulently issued debit cards before they were ever delivered. Clever.

But not quite clever enough. Once Broadhurst identified the debit cards issued to the eight victims, he obtained the ATM withdrawal history of each card so he could determine when and where they had been used. Surveillance from the bank branches showed the perpetrator, and at Broadhurst's request, PNC Bank delivered photographs taken from its ATM cameras. A visible license plate number led to a Hertz rental car agreement in Yvenel's name. Broadhurst pulled Yvenel's driver's license photograph and compared it to the man depicted in the ATM photographs. It looked like a match. Based on Broadhurst's testimony, a grand jury indicted Yvenel.

There was just one problem: as investigators learned more about the scheme, it became clear that the man in the photographs was not Yvenel, but his brother, Mikel Clotaire. The original indictment against Yvenel was dismissed, and in February 2017 a grand jury indicted *both* brothers on the counts listed above. The two were tried separately, and each was convicted. This is Mikel's appeal.[1]

---

[1] Yvenel did not appeal his conviction.

## II.

This Court ordinarily reviews evidentiary rulings for an abuse of discretion. *United States v. Caraballo*, 595 F.3d 1214, 1226 (11th Cir. 2010). We review de novo whether a hearsay statement is testimonial and implicates the Sixth Amendment's Confrontation Clause. *Id.*

When a party failed to object to an evidentiary ruling at trial, we review for plain error. *United States v. Hesser*, 800 F.3d 1310, 1324 (11th Cir. 2015). "To find plain error, there must be: (1) error, (2) that is plain, and (3) that has affected the defendant's substantial rights." *Id.* (quoting *United States v. Khan*, 794 F.3d 1288, 1300 (11th Cir. 2015)). We may exercise our discretion to correct errors that meet these conditions and "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005)).

## III.

Mikel's trial defense was based on a theory of mistaken identity. The government's case depended on the surveillance images taken from PNC Bank's ATMs, and Mikel's counsel doggedly challenged the factual basis of the government's identification. This approach meant casting doubt not only on the reliability of the images, but on government witnesses who identified Mikel—or ruled out Yvenel—as the man captured in the images. Now on appeal, Mikel targets the legal basis of the identification on a number of fronts. He challenges (1) the admission of the ATM images, (2) various trial court decisions that limited his ability to challenge the accuracy of the government's identification, (3) the

4

admission of Special Agent Broadhurst's putative expert testimony regarding camera distortion, (4) the admission of lay identification testimony by Yvenel's Postal Service supervisor, and (5) the admission of his post-arrest booking photograph. Additionally, Mikel argues that even if none of these errors are reversible by themselves, their cumulative effect denied him a fair trial.

## A.

Broadly speaking, Mikel challenges the admissibility of the images derived from surveillance video taken by PNC Bank ATMs on three fronts. *First*, Mikel says that the photographs were not properly authenticated as business records. *Second*, he argues that the images were testimonial hearsay. *Third*, he argues that the Rule 902(11) certifications themselves violated the Confrontation Clause. We reject each of these contentions.

## 1.

Before trial, the government declared its intent to admit the ATM photos as records of regularly conducted business activity pursuant to Federal Rules of Evidence 902(11) and 803(6). Under Rule 902(11), an item of evidence is "self-authenticating" if it is an "original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)–(C)."[2] Rule 803, in turn, provides that a business record is admissible if three conditions are met: (A) "the record was made at or near the time by—or from information transmitted by—someone with knowledge,"

---

[2] The government argues that the surveillance images were also authenticated under Rule 901. Because we hold that the images were properly authenticated as business records, it is unnecessary to analyze this alternative basis for authenticating the records.

5

(B) "the record was kept in the course of a regularly conducted activity of a business," and (C) "making the record was a regular practice of that activity."[3] Fed. R. Evid. 803(6).

No one contests that PNC Bank's full surveillance videos are business records. But as for the photo stills pulled from the videos, Mikel argues that they were created for the purposes of litigation and thus are not business records within the meaning of the Federal Rules. Our question, then, is whether the images used at trial were new "records" apart from the videos from which they were derived.

We start with the basics. One way to look at these exhibits is as a format change—from video to photograph. Under that view they are admissible; an otherwise-admissible business record does not become a new, inadmissible record merely because its format is adapted for trial display. For instance, we—like several of our sister circuits—have no doubt that electronic business records may be printed for trial. Leading the way on this issue, the Tenth Circuit rejected the argument that information in a government database "was prepared for purposes of trial" and thus was not admissible as a business record merely because it was printed out. *United States v. Hernandez*, 913 F.2d 1506, 1512 (10th Cir. 1990). That argument "misconstrues the essence" of the business records rule: "so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice, the fact that the hard copy offered as

---

[3] Rule 803(6) is commonly invoked as an exception to Rule 802's prohibition on hearsay evidence. This application of the Rule is not at issue because the ATM photos are not hearsay. *See* section III.A.2, *infra*.

6

evidence was printed for purposes of litigation does not affect its admissibility." *Id.* at 1512–13; *see also United States v. Keck*, 643 F.3d 789, 797 (10th Cir. 2011) ("In the context of electronically-stored data, the business record is the datum itself, not the format in which it is printed out for trial or other purposes.").

We echoed this holding in *United States v. Ross*, explaining that foreign immigration records were not inadmissible merely because "they consisted of computer print-outs prepared for purposes of litigation." 33 F.3d 1507, 1517 n.17 (11th Cir. 1994). The Second and Seventh Circuits are also in accord. *See Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994) (quoting and adopting the rule in *Hernandez*); *United States. v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002) ("Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6), even though the printouts themselves are not kept in the ordinary course of business."). So as a general rule, the format of an extracted dataset has nothing to do with whether it qualifies as a business record. What matters is whether the *original* record met the requirements of Rule 803(6).

The general principle described in these cases can be supported in two important ways. *First*, while the format of the records was changed, their communicative content was not. And *second*, little human discretion or judgment was involved; only a technical format change was needed. Both points hold up here. The message of the tape—"this is the image of the person using the ATM at this time"—did not change. Nor did providing a still frame photo require anything more than technical expertise.

7

Another way to look at these photos is as a subset of available data; extracting static images from a video is like printing a selection of pages from a longer record, not like creating a new document that summarizes an original record. After all, a video is nothing more than a series of static images appearing at a given frame rate. *See*, *e.g.*, Soharab Hossain Shaikh et al., *Moving Object Detection Using Background Subtraction* 1 (2014) (stating that "a video consists of a sequence of static images or frames"). Selecting a still frame from a video does not create communicative content any more than introducing a single page from a record book.

Nor does the government's selection of which record—or which portion of a longer record—to introduce at trial transform a qualifying business record into a record prepared for the purposes of trial. For instance, in *United States v. Sanchez*, the government entered into evidence certain call records extracted from the database of a cellular telephone provider. *See* 586 F.3d 918, 927–29 (11th Cir. 2009). We treated the business record as the database itself. *See id.* at 928–29. There, as here, the government only requested the portions of the business record relevant to its case. In *Sanchez*, that meant call records of the four defendants. *Id.* at 926. Here, it meant still frame photos that established Mikel's location at a certain time and place.

Again, no one doubts that the surveillance videos themselves were self-authenticating business records under Rule 803(6). The still frame photos pulled from the tape are no different than wheeling a television into the courtroom with

8

the video paused at just the right frame, either in what they communicated or in how they did it.  The photos were self-authenticated business records.

2.

Even so, Mikel argues that the person who pulled still frames from the video surveillance reel is a witness against him, and that he therefore had "the right to confront the methods used to produce the images and the opportunity to cross-examine someone with knowledge of how the exhibits" were created.  We disagree.  The Confrontation Clause provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The problem for Mikel is that the Confrontation Clause "only applies to 'testimonial statements,' specifically testimonial hearsay."  *United States v. Curbelo*, 726 F.3d 1260, 1272 (11th Cir. 2013) (quoting *Crawford v. Washington*, 541 U.S. 36, 53, 59 (2004)).  And that's not what is at issue here.

When the Supreme Court decided *Crawford*, it gave form to the category of testimonial statements:

> Various formulations of this core class of testimonial statements exist: *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009) (quoting *Crawford*, 541 U.S. at 51–52) (alteration in original).

9

Some cases are close on whether a document fits within that category; this one is not.  Still frame pictures are not statements at all, let alone testimonial ones.[4] We understand intuitively that pictures are not witnesses; pictures "can convey incriminating information . . . .  But one can't cross-examine a picture." *United States v. Wallace*, 753 F.3d 671, 675 (7th Cir. 2014); *see also* Paul F. Rothstein, Federal Rules of Evidence 737 (3d ed. 2019) (collecting similar cases). Surveillance cameras are not witnesses, and surveillance photos are not statements. This commonsense conclusion is supported in the Federal Rules, which define a statement as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."  Fed. R. Evid. 801(a).  And while that Rule does "not formally demarcate the scope of 'statements' for Confrontation Clause purposes," we have already recognized its definition as "uncontroversial, especially since the Sixth Amendment provides the right to confront (human) witnesses." *United States v. Lamons*, 532 F.3d 1251, 1263 (11th Cir. 2008) (internal quotation marks omitted).  So the photos themselves pose no problem under the Confrontation Clause.

But what about the person who pulled them from the surveillance tapes?  We are not persuaded by Mikel's argument that the photos were somehow "enhanced"

---

[4] This conclusion does not—and cannot—rest on our determination that the ATM photographs are business records.  In *Melendez-Diaz*, the Court held that that "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial."  557 U.S. at 324.  Thus, Mikel's Confrontation Clause claim turns on whether the records are testimonial and not whether they otherwise meet the Rule 803(6) requirements.

10

in a manner that turned them into the testimony of the bank employee who pulled them. He points to an email sent by a PNC Bank employee named Natalie Moran to Broadhurst. The email included several ATM surveillance images, along with the following note describing Moran's effort to obtain the clearest photo:

> I know from the previous request that you preferred to have the time stamp indicating the card information on the photo, but some did not give me the time stamp. I scanned through the entire transaction hoping to get the stamp and this is the best I could obtain. I also tried to get the best quality photo, but some are a little dark and when lightening the image became distorted. Please let me know if there is anything else I can assist with.

Even if we were to assume that Moran's email is evidence that the photos entered at trial underwent some post-capture processing for clarity—though the email arguably suggests the opposite—that would not make the photos testimonial statements. An assertion happens when a person speaks, writes, or acts "with the intent of expressing a fact or opinion." *Black's Law Dictionary* (11th ed. 2019). Processing an image is not an oral or written assertion, so it could only be a statement if it were nonverbal conduct intended as an assertion. *See* Fed. R. Evid. 801(a). In her role as photo processor, Moran was doing nothing but getting the clearest image; she made no assertion about what the image showed or who it might be. We cannot see how the photo itself or the person who pulled it was intending to assert anything.

That conclusion dooms Mikel's argument. Because neither the surveillance photos nor their (purported) enhancement can be considered statements at all, much less testimonial ones, Mikel's Confrontation Clause argument fails.

11

3.

Mikel's last business record argument is that the certifications for the photos were testimonial. But that contention is also foreclosed by *Melendez-Diaz*. There, the Supreme Court distinguished between authentication and creation of a record and stated that a clerk could not "*create* a record for the sole purpose of providing evidence against a defendant," but could, with an affidavit, authenticate an otherwise admissible record. 557 U.S. at 322–23. That's what happened here, so we join other circuits in concluding that business records certifications are not testimonial. *See*, *e.g.*, *United States v. Yeley-Davis*, 632 F.3d 673, 680 (10th Cir. 2011); *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006).

B.

Mikel next asserts that, through various evidentiary rulings, the district court improperly limited his ability to present a full and fair defense. For ease of organization, we divide these objections into two groups: (1) evidence related to the government's initial misidentification of Yvenel as the man in the ATM photos and (2) emails involving Special Agent Broadhurst. None of the trial court decisions challenged by Mikel amount to an abuse of discretion.

1.

At trial, Mikel sought to emphasize the government's initial wrongful identification. He claims that he was wrongly prevented from inquiring on cross-examination about (1) the professional background of Special Agent Pesaro, the supervisor who agreed with Broadhurst's initial misidentification; (2) the grand

12

jury's indictment of Yvenel; and (3) the arrest warrant of Yvenel. He also contends that the district court erred in failing to admit a copy of the arrest warrant.

Trial judges "retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, confusion of the issues or interrogation that is repetitive or only marginally relevant." *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1370–71 (11th Cir. 1994). Here, the trial judge did not go beyond those bounds. Mikel was able to establish that Broadhurst's supervisor reviewed his investigative report, that a grand jury had previously indicted Yvenel, and that an arrest warrant had been issued for Yvenel. The professional background of Broadhurst's supervisor, the number of people on the grand jury, and Yvenel's original arrest warrant were only marginally relevant and could have confused the real issues in the trial. "[W]here the proffered evidence does not bear a logical relationship to an element of the offense or an affirmative defense, whether direct or indirect, a defendant has no right to introduce that evidence and a district court may properly exclude it." *United States v. Hurn*, 368 F.3d 1359, 1365 (11th Cir. 2004). The limits set by the district court were well within the court's discretion.

Nor did the district court cause any prejudice by announcing these and other evidentiary rulings before the jury. Here, all the district court did was rule on evidentiary objections—and if that were a problem, it would be one in every other trial too. We see no error.

13

2.

Mikel also claims that the district court wrongly excluded two emails sent to Broadhurst. As discussed above, Moran sent Broadhurst several surveillance photos, noting that "some are a little dark and when lightening the image became distorted." And in another email, the prosecutor sent Broadhurst a phone number possibly associated with Mikel and asked if the number "cross references with any of our information."

The district court properly excluded both emails as hearsay. The Moran email was offered to demonstrate that the bank's surveillance images may have been distorted. The prosecutor's email was offered to show that the government was investigating an additional phone number associated with Mikel. In other words, both Moran's email and the prosecutor's email were offered to prove the truth of the matters asserted by the declarants.

Mikel certainly had the right to challenge the reliability of the photos. But under the Federal Rules of Evidence, there are right ways and wrong ways to explore this issue. We note that while questioning Broadhurst about the content of the email with Moran, Mikel countered the government's hearsay objection by stating the question was for impeachment purposes. The judge properly allowed the question. But when Mikel sought to admit Moran's email in its entirety, he gave no indication that the email was offered for anything other than proof of the matter asserted in the email. And although Mikel's brief gestures at arguments that the emails were offered for impeachment purposes, these arguments were never fully developed and—more importantly—never raised at trial.

14

Even assuming that one or both of the emails could have been offered at trial for impeachment purposes, Mikel did not make that argument at trial. Nor will we consider it here. No legal rule required the trial court to suggest that Mikel try impeaching Broadhurst with either email, so its failure to do so was not error. *See United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013) (defining error as "[d]eviation from a legal rule") (alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 732–33 (1993)). After all, offering the emails as substantive proof is categorically different than offering them for proof that Broadhurst was an unreliable witness. On appeal, it is thus irrelevant what would have happened had Mikel offered the emails for an entirely different purpose. We do not sit in review of hypotheticals.

In any event, Mikel could have subpoenaed Moran as a defense witness. The defense's ability to subpoena a witness is not a substitute for confrontation, *see Melendez-Diaz*, 557 U.S. at 324, but sworn testimony from the declarant is a substitute for the admission of hearsay. As we explained above, Mikel did not have a Sixth Amendment right to confront Moran. What he did have is a right to procure testimony from Moran—a right he chose not to exercise.

C.

Mikel argues that two aspects of Broadhurst's testimony were inadmissible expert testimony: his statements about the difference between what one sees with the naked eye and what one sees in a two-dimensional photograph, as well as his statements about the difference between needle distortion and barrel distortion caused by a camera lens.

15

A lay witness can give testimony "rationally based on the witness's perception." Fed. R. Evid. 701(a). "Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." *United States v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011). It does not take specialized expertise to understand that three-dimensional objects may look different in person than in a two-dimensional photograph. Therefore, the district court did not err in allowing Broadhurst to attest to this basic point.

As for Broadhurst's testimony on the two types of camera distortion, the government concedes that this was expert witness testimony subject to Rule 702 of the Federal Rules of Evidence. Rule 702 allows a witness to testify as an expert if he is qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. To qualify an expert under this rule, the district court must ordinarily act as a "gatekeeper" and "conduct an exacting analysis" of the basis for the expert's testimony. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256–57 (11th Cir. 2002) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)).

But Mikel never objected to Broadhurst's qualifications or claimed that his testimony about the camera distortions was unreliable. Accordingly, we review the district court's implicit rulings about Broadhurst's qualifications and testimony for plain error. *See United States v. Frazier*, 387 F.3d 1244, 1268 n.21 (11th Cir. 2004) (en banc). The record establishes that, prior to entering government service, Broadhurst had specialized training and experience working with closed circuit television cameras. During Broadhurst's testimony, he connected his opinions

16

about the camera distortions to knowledge from this experience working with security camera footage. Based on this record, we cannot say that the district court erred, let alone plainly, by allowing Broadhurst to testify about the distortions.

Mikel objects that the government never filed notice of Broadhurst's expert testimony, but that makes no difference because the government only has an obligation to provide the defense advance notice of expert witnesses (along with a summary of their testimony) if the defendant makes a request. *See* Fed. R. Crim. P. 16(a)(1)(G). Mikel never did.

### D.

Mikel next argues that the government did not establish the proper foundation for the lay identification testimony of Yvenel's U.S. Postal Service supervisor, Lori Giordano. Among other things, Giordano testified that the person in the ATM surveillance photos was *not* Yvenel.

We have expressly approved lay identification testimony where "there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *United States v. Pierce*, 136 F.3d 770, 774 (11th Cir. 1998) (quoting *United States v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984)). That liberal standard is easily met here. The trial transcript shows that Giordano had "personal interaction" with Yvenel due to her position as his supervisor. Additionally, she interacted with him across a period of time in which his hairstyle changed. We thus find a reasonable basis for concluding that Giordano was more likely to correctly rule out the identification of Yvenel—who was not in the courtroom—than members of the jury. Mikel's suggestion that

17

Giordano's testimony was less reliable because she met with prosecutors before testifying does not firm up his argument. Any of a number of reasons explain why, beginning with the fact that it is not at all uncommon for witnesses to meet with lawyers before testifying. And in any event, Mikel was able to question Giordano on cross-examination about her contact with the government.

E.

The district court also permitted the government to introduce (over objection) Mikel's booking photograph—otherwise known as a mug shot—into evidence so that the jury could compare the ATM surveillance photos with a more contemporaneous photo of Mikel. Mikel argues that this was an abuse of discretion under Rule 403, which provides that the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. But Mikel ignores this Circuit's mug shot precedent.

Before turning to that precedent, we pause to appreciate the longstanding judicial skepticism about the use of mug shots in criminal trials. That skepticism is appropriate. Rule 404 prohibits the government from introducing evidence of a prior crime or wrongful act to prove the defendant's bad character and show that he acted in conformance with that character. *See* Fed. R. Evid. 404(b)(1). Yet through "police notations or the appearance or pose of the accused," a mug shot may "indicate to the jury that the accused has a history of convictions or arrests"— even where that kind of evidence is otherwise excluded. *United States v. Reed*, 376 F.2d 226, 228 n.2 (7th Cir. 1967). It is completely unacceptable for the

18

government to introduce a mug shot in order to draw attention to the defendant's prior troubles with the law. That evidence might tempt the jury to prejudge the defendant, denying him "a fair opportunity to defend against a *particular* charge." *Michelson v. United States*, 335 U.S. 469, 476 (1948) (emphasis added).

Still, mug shots are not categorically barred; the danger of unfair prejudice will not always substantially outweigh the probative value of the photos in establishing the defendant's identity. In *United States v. Hines*, we held that introducing a defendant's mug shot would be error unless the government satisfied three prerequisites. 955 F.2d 1449, 1455–56 (11th Cir. 1992). *First*, the "Government must have a demonstrable need to introduce the photographs." *Id.* at 1455. *Second*, the "photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record." *Id. Third*, the "manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs." *Id.* at 1455–56. We consider these in turn.

The opening *Hines* requirement is demonstrable need. *Id.* at 1455. Here, the meaning of "need" is crucial. If need is demonstrated by the importance of the defendant's identity, then the standard is likely satisfied. If, on the other hand, need implies a total lack of alternatives, then the standard is not met. *Hines* does not describe the standard with precision. And surprisingly enough, in the 28 years since *Hines*, our Court has not had occasion to apply its three-part test to another case. We thus look to *Hines*'s predecessor cases for the guidance we need.

19

The *Hines* requirements originated in the Second Circuit case *United States v. Harrington*, 490 F.2d 487 (2d Cir. 1973). There, a crucial government witness failed to make an in-court identification of the defendant. In an attempt to rehabilitate the witness, the government had the witness replicate his previous out-of-court identification from a mug shot. *Id.* at 489. Although the government had produced testimony from two other witnesses that connected the defendant with stolen property, the court found that "inasmuch as the expected identification from [the witness] was an integral element in the scheme of the Government's proof, we conclude that this first prerequisite has been satisfied." *Id.* at 495.

*Harrington* was not directly cited by *Hines*, but it formed the basis for two cases that were. The earlier case was *United States v. Fosher*, a First Circuit decision finding that demonstrable need was met where the "matter of identification was crucial to the government's case." 568 F.2d 207, 215 (1st Cir. 1978). Likewise, in *United States v. Torres-Flores*, the Fifth Circuit found demonstrable need when identification was "the crux of the Government's case." 827 F.2d 1031, 1039 (5th Cir. 1987). Neither *Fosher* nor *Torres-Flores* conducted any comparative assessment of alternative pieces of evidence the government might have relied on instead of the mug shots. And both cases contrast with *Hines* itself, where the defendants rested their case not on a defense of mistaken identity, but one of consent. *See Hines*, 955 F.2d at 1456. Thus, in *Hines* we said that the government did not show demonstrable need because "the identity of the defendants was never at issue" once the trial started. *Id.*

20

The lesson we take from all four cases—*Harrington* through *Hines*—is that the government meets its burden under the first requirement when identification of the defendant is central to the government's case. Here, that standard is easily met. The government's case hinged on whether Mikel was the man pictured in the ATM surveillance images. At trial, the government contended that introducing the mug shot was necessary so that the jury would have a depiction of Mikel that was roughly contemporaneous with the ATM photos. Specifically, the mug shot showed Mikel with dreadlocks, which he lacked at trial. Mikel countered that his June 2012 passport photograph would have been just as probative as his October 2016 mug shot because it was slightly closer in time to the dates of the ATM photographs (between March and May 2014). But as a court of review, it is not our role to determine whether Mikel's passport photograph or mug shot bears a better resemblance to the ATM photos. It is enough, at least for the first prong of *Hines*, that Mikel's identity was crucially important in the case, and that the trial court did not abuse its discretion in concluding that the mug shot would assist the jury in determining whether Mikel was, in fact, the man in the surveillance images.

*Hines*'s second requirement—that the photos cannot imply that the defendant has a prior criminal record—goes to the heart of the Rule 404 concern. *See* 955 F.2d at 1455. Here, the prosecutor and the judge informed the jury that "the photograph was taken on October 11th, 2016." Since this was the date of Mikel's arrest on the charges being prosecuted, the stipulation effectively removed the implication of a prior arrest. We are not the first court to reach this conclusion. In *Harrington*, for instance, there was "no chance whatsoever that the jury could

21

infer a prior criminal record" because a police officer testified that the mug shot was taken at the time of the defendant's arrest for that case. 490 F.2d at 494; *accord United States v. Mohammed*, 27 F.3d 815, 822 (2d Cir. 1994) (no error where "the photographs were taken at the time of Mohammed's arrest for the crimes charged in *this* case") (emphasis in original); *Murray v. Superintendent, Kentucky State Penitentiary*, 651 F.2d 451, 454 (6th Cir. 1981) (since the jury already knew the defendant's criminal record, his "mug shots revealed nothing that the jury did not already know").

But a stipulation is not a free pass—showing the jury an obvious mug shot could still weaken the defendant's presumption of innocence by stigmatizing him with "an unmistakable badge of criminality." *Eberhardt v. Bordenkircher*, 605 F.2d 275, 280 (6th Cir. 1979). By way of example, the characteristic "double-shot" display—adjacent front and profile photographs—"is so familiar, from 'wanted' posters in the post office, motion pictures and television" that the inference of criminality is "natural, perhaps automatic." *Barnes v. United States*, 365 F.2d 509, 510–11 (D.C. Cir. 1966); *cf. Estelle v. Williams*, 425 U.S. 501, 504–05 (1976) (the "distinctive, identifiable attire" of prison inmates "may affect a juror's judgment"). The harm can be even more obvious when, as in *Hines* itself, the defendant's mug shot is shown to the jury as one of several photos in a police department's photo array—a so-called "rogues' gallery" of suspected criminals. *Hines*, 955 F.2d at 1456; *see also Fosher*, 568 F.2d at 213 ("[M]ug shots from a police department 'rogues' gallery' are generally indicative of past criminal conduct and will likely create in the minds of the jurors an inference of such

22

behavior."). The point is that the government cannot do its best to make the defendant look like a hardened criminal and then wash away the stain of prejudice by stipulating that the mug shot was not from a previous run-in with the law.

But that is not what happened here. The government introduced only the direct shot of Mikel, removing the profile picture so emblematic of a mug shot. Additionally, jailhouse administrative markings were removed from the photograph. These were important steps. We note, however, that the photograph shows Mikel wearing standard-issue jailhouse garb, which may or may not have been apparent to jurors. Additionally, the photograph's background shows visible height gauges. *See Torres-Flores*, 827 F.2d at 1039 (criticizing visible measuring tape in a mug shot). The picture could have been cropped from the shoulders up, and the height gauges could have been edited out. After all, if the jury is unaware that the defendant was in police custody when the mug shot was taken, there will be even less opportunity for an inference—even an inaccurate one—that the defendant has a prior criminal record. Nonetheless, because the jury had no reason to suspect that the photo was taken from an earlier brush with the law, Mikel's mug shot satisfies *Hines*'s second prong.

The third *Hines* requirement is that the manner of introducing the photograph into evidence not draw attention to its source or implications. *See* 955 F.2d at 1455–56. Essentially, counsel should not put on a show about the fact that they are introducing a mug shot, or even have a dialogue with the court about it in front of the jury. In *Fosher*, the First Circuit said that the "preferable approach" for admitting a mug shot "would be to require a proffer of the evidence and rule on

23

its admissibility out of the hearing of the jury." 568 F.2d at 216. We agree, and that is precisely what happened here. Unlike in *Harrington*, the debate over the propriety of the mug shot took place away from the jury. *See* 490 F.2d at 495; *see also Fosher*, 568 F.2d at 216 (the "unique character of the photograph" was accentuated by a lengthy open court debate over the rules of evidence). And unlike in *Torres-Flores*, where the government brought out testimony that the Border Patrol kept the photos in their locker room, Mikel's prosecutor did not draw attention to how or under what circumstances the photographs were taken. *See* 827 F.2d at 1039. Because of the care taken by the district court, the photo's introduction satisfies the third prong of *Hines*.

In sum, the circumstances of this case and the condition of this photo meet the *Hines* requirements. Mikel's trial defense made his identity the central question in the case, and the photo had significant probative value. The government took steps to reduce the prejudicial nature of the photo, which was far from the "rogues' gallery" photos that earlier cases rightfully rejected. Even assuming that more could have been done to sanitize the photo, the stipulation about the photo's date sufficed to remove any implication that Mikel had a prior criminal record. Finally, the government did not accentuate the prejudicial implications of the mug shot by debating its admissibility in front of the jury or by eliciting testimony that gratuitously linked the photo to criminality. Taking all of these factors into account, we find that it was not error to admit Mikel's booking photo.

24

F.

Mikel also raises the cumulative error doctrine.  "The cumulative error doctrine provides that an aggregation of non-reversible errors can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Cooper*, 926 F.3d 718, 739 (11th Cir. 2019) (internal alterations and quotation marks omitted).  Having found no error, we naturally find no cumulative error.  Mikel's convictions are affirmed.

**AFFIRMED.**