**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Luke K. HINES, Fred Crenshaw III, Defendants–Appellants.**

**No. 91–8163.**

United States Court of Appeals, Eleventh Circuit.

March 17, 1992.

---

Gregory E. Bennett, Savannah, Ga., for Hines.

Charles M. Jones, Hinesville, Ga., for Crenshaw.

Kathryn M. Aldridge, Asst. U.S. Atty., Savannah, Ga., for U.S.

Before KRAVITCH, and EDMONDSON, Circuit Judges, and HENDERSON, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

## I.  INTRODUCTION

Defendants-appellants Luke K. Hines and Fred Crenshaw III appeal their December 4, 1990 convictions in the Southern District of Georgia on one count each of aggravated sexual assault, 18 U.S.C. § 2241, and one count each of aiding and abetting one another.  18 U.S.C. § 2.

Appellants raise three issues on appeal: (1) The lack of a jury instruction specifically detailing the defense of consent; (2) the testimony given by a Government witness that referred to aliases used by the defendants and to the fact that Crenshaw was incarcerated at the time of questioning; (3) the admission into evidence of "mugshots" as unfairly prejudicial.  We hold that neither the court's failure to give a jury instruction on consent nor the Government's use of aliases was error.  We also hold that the court's admission of the testimony referring to Crenshaw's questioning in jail was not an abuse of discretion.  The court's admission of the defendants' mugshots, however, was an abuse of discretion and cannot be considered harmless beyond a reasonable doubt.  For this reason, we vacate the convictions and remand to the district court for a new trial.

## II.  FACTS

On February 13, 1990 Kache Willis Kleckely[1] left the trailer home in the Fort Stewart, Georgia area where she was staying with a friend of her then-fiance (now husband).  Willis walked to the mailbox in the trailer park, intending to mail some greeting cards, but was unable to do so because they were too big for the slot.  She then began to walk down the road away from the trailer park in search of another mailbox.  The defendants, who were driving along the same road, offered Willis a ride to the local post office and back, an offer she accepted.  Neither Willis nor her fiance had a car and it was not unusual for them to accept rides on and around Fort Stewart.  Hines, who called himself "Ronnie," was driving and Crenshaw, who called himself "Johnny," was lying down in the passenger seat; Willis got in and sat in the back seat of the car.

The early part of the trip was uneventful.  Willis testified that Crenshaw and Hines took her to the post office in Waltourville, where she mailed her cards and letters.  They told her they would take her home, but first wanted to see someone who owed them money and lived "way out" from Fort Stewart.  Willis stated that she did not object to the trip and that they stopped along the way at a gas station for fuel, where the defendants also purchased beer.  Willis testified that she first became nervous about being alone with the defendants when she saw signs pointing to Jacksonville and Savannah, but was reassured when she realized they were re-entering Fort Stewart.  Instead of returning to Willis' home, however, Hines turned onto a dirt road that entered a wooded area, stopped the car, and indicated that there was something wrong with the engine.  After mentioning that it might be overheated, he turned the car around to face the main road.  Instead of returning to the highway, he put the car into reverse and backed

---

1.  At the time of the incident, the complainant was known by her unmarried name, Willis.  The trial transcript refers to her as Willis, and we will do the same.

further into the woods. Hines stopped the car again, got out, and walked a short distance into the woods before returning.

At this point, Willis' and the defendants' stories diverge. Willis testified that Hines and Crenshaw climbed into the back seat with her, Hines told her he wanted to have sex with her and began to touch her. Willis says she hit Hines' hand away from her but Hines enlisted Crenshaw's help in holding Willis down while both Hines and Crenshaw removed her clothes. First Hines and then Crenshaw had intercourse with Willis, which, she testified, was without her consent.

According to Hines,[2] the three had been flirting throughout the entire car trip and each of the defendants engaged in consensual sex with Willis. Hines testified that when he returned to the car after walking into the woods to look for help with the overheated engine, Willis and Crenshaw were engaged in sexual activity in the back seat. Hines subsequently also engaged in consensual intercourse with Willis.

Both Hines and Willis agreed that after the intercourse, the defendants drove Willis back to the trailer park. On returning home, Willis called her housemate at his workplace, reported what had happened, and asked that he come home immediately. At her friend's urging, she called the local police department. She was questioned by police officers and taken to the Liberty County Hospital Emergency Room, where she was examined and released.

Willis gave Hinesville Police Department officers descriptions of the men she alleged had attacked her and explicit directions to where the attack had occurred. The wooded area where the car was parked was found to be located on Fort Stewart, within the territorial jurisdiction of the United States. The FBI was included in the investigation and prosecution was subsequently prepared by the Office of the United States Attorney for the Southern District of Georgia. The FBI and local police officers searched the area and essentially corroborated Willis' description of the scene.

Upon returning to the Hinesville Police station, FBI Special Agent Charles Gabriel and Hinesville Police officers composed two photospreads, each consisting of six photographs of individuals who fit the general physical description of the men identified by Willis as "Ronnie" and "Johnny." Willis examined the photospreads and positively identified two men as her assailants; Johnny was subsequently identified as Fred Crenshaw III and Ronnie was identified as Luke K. Hines. Crenshaw was known to the police as Eric James and the search warrant for his person to obtain bodily fluids was made out in that name. Crenshaw was located at Liberty County jail under the name of Eric James where he was being incarcerated for other activities unrelated to this charge. At trial Crenshaw frequently was referred to as Eric James as well as Eric Johnson, another name by which he was known.

Hines was located at his home in Hinesville and was questioned about Willis' allegations. Hines initially told the police that he had been at work the day Willis said she was attacked and did not know Willis. He later told the police that both he and Crenshaw had been with Willis and had had consensual intercourse with her.

The automobile described by Willis had been impounded by the Hinesville Police Department following an unrelated accident and was in police custody. After obtaining a search warrant, SA Gabriel searched the car, where he found numerous stuffed animals that had been described in detail by Willis.

At trial Hines maintained that Willis had consented to sexual intercourse with him and Crenshaw; Willis testified that Crenshaw and Hines had used force against her. The physical evidence was ambiguous. The physician who examined Willis in the emergency room testified that Willis had not suffered serious physical injury, but that she had evidence of muscle spasms and tenderness—signs of "overuse" that were neither inconsistent with, nor proof of, forcible intercourse.

---

2. Crenshaw chose not to testify at the trial.

SA Gabriel testified regarding Willis' identification of Crenshaw and Hines, whom Willis knew only as Johnny and Ronnie. He described how the photospreads had been put together and stated that Willis had positively identified her assailants. Over defense objections, the district court allowed the Government to introduce the photospreads as evidence of a prior identification of the defendants by Willis, although at trial Hines did not deny knowing or being with Willis.

SA Gabriel also described how he had located the defendants, and included the fact that Crenshaw was first interviewed in jail. The defense objected to the mention of Crenshaw's incarceration as unfair character evidence, but the district court overruled after reviewing the entirety of SA Gabriel's testimony.

At all points subsequent to the initial police interview, Hines did not deny that he and Crenshaw had sexual intercourse with Willis on February 13, 1990. Instead, Hines maintained that Willis had consented to intercourse and therefore no assault had occurred.

The Government was made aware before trial that neither Hines nor Crenshaw would present an alibi defense. The trial did not center on physical evidence or any question of identity; as the Government made clear in its closing argument, the credibility of Hines and Willis were essentially the only issues for the jury.

At the end of closing arguments the defense made a motion for acquittal, which was denied by the district court. The court charged the jury on the elements of aggravated sexual assault, including the requirement that the defendants had used force or the threat of force in order to engage Willis in sexual intercourse. The defense did not request a specific charge that consent to sexual intercourse is a complete defense to the charge of aggravated sexual assault, nor did the trial court include such a charge. The jury returned a verdict of guilty later the same day.

## III. ANALYSIS

### A. The Jury Charge

■■■■ Appellants contend that the district court committed reversible error by failing to charge the jury that consent to sexual intercourse is a complete defense to the offense of aggravated sexual assault. Appellants admit that they neither requested such a charge nor objected to the substance of the charge actually given before the case was submitted to the jury. According to the Federal Rules of Criminal Procedure, absent timely objection, only *plain error* in a charge warrants reversal. Fed.R.Crim.P. 30; Fed.R.Crim.P. 52(b). Plain error results only if "when examined in the context of the entire case, [it] is so obvious that failure to notice it would seriously affect the fairness, integrity and public reputation of the proceedings." *United States v. West*, 898 F.2d 1493, 1498 (11th Cir.1990), *quoting United States v. Walther*, 867 F.2d 1334, 1343–44 (11th Cir.1989).

Appellants contend that *United States v. Elkins*, 885 F.2d 775 (11th Cir.1989), *cert. denied*, 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990), compels reversal. *Elkins*, however, holds only that it is reversible error for a judge to *refuse* a defense request for a jury instruction on a valid defense that has an evidentiary foundation. In fact, a careful reading of *Elkins* makes clear that there was no reversible error in this case:

> In reviewing jury instructions, this Court must evaluate whether the entire charge, taken as a whole, adequately presented the issues and the law to the jury. The trial judge has broad discretion in formulating a jury charge, and will not be reversed unless the charge does not correctly state the substance of the law and the facts.

*Id.* at 788.

A district judge must charge the jury on all the elements of the crime whether or not the defense makes such a request. Thus, failure by the district court to include the essential elements of the crime in the charge would be reversed as plain error, whether or not the defense objected. In this case, however, the district court cor-

rectly detailed the elements of aggravated sexual assault to the jury, including the requirement that the jury find that the defendants used force against the complainant in order to engage in sexual intercourse with her. Further, the appellants made clear throughout the trial that their only defense was consent, and that the Government's case focused on rebutting appellants' claim that the complainant willingly engaged in sexual intercourse.

In sum, the defense made its theory of consent abundantly clear to the jury and the trial judge correctly stated the law on aggravated assault. Accordingly, we hold that the charge to the jury contained no reversible error.

### B. Character Evidence

Appellants next argue that the Government introduced unfairly prejudicial character evidence when (1) it repeatedly referred to Crenshaw and Hines by several aliases, which were also listed in the superseding indictment; (2) a Government witness, FBI Special Agent Charles Gabriel, testified that he first interviewed Crenshaw in jail; and (3) the United States introduced mugshots as proof that the complainant had previously identified the defendants as her assailants.

■ Evidentiary rulings by a trial court will not be overruled unless they constitute an abuse of discretion. *See West*, 898 F.2d at 1499. The use of character evidence must be scrutinized carefully because of its powerful impact and its potential for unfair prejudice. The need for caution should be emphasized in this type of case, in which consent is the sole defense to a charge of aggravated sexual assault, and the verdict hinges on the jury's evaluation of the credibility of the defendants and the complainant.

### 1. *Aliases*

■ Appellants contend that the use of aliases in testimony and in the indictment was reversible error because it amounted to improper evidence of Cren-

shaw's previous arrests and both defendants' bad character. It is clear, however, that "[t]he use of an alias in an indictment and in evidence is permissible if it is necessary to connect the defendants with the acts charged." *United States v. Jorge–Salon*, 734 F.2d 789, 791–92 (11th Cir.1984). In this case the Government produced substantial evidence that the appellants had used all of the different names listed in the indictment and mentioned during testimony. The complainant testified that Hines identified himself to her as "Ronnie," and Crenshaw identified himself as "Johnny." Crenshaw subsequently told SA Gabriel that his true name was Eric James, R2–73–15; FBI records, however, identified him as Eric Johnson. Crenshaw told the trial court that his true name is Fred Crenshaw III, which was used throughout trial. The Government connected the appellants to all of the aliases referenced at trial; it was not error to allow their use in evidence.

### 2. *Testimony of Special Agent Gabriel*

■ Appellants object to testimony by Government witness SA Gabriel that revealed that Crenshaw was in jail when first interviewed by the police.

> Q: Pursuant to the search warrant, how did you locate the person who was named in the search warrant?
>
> A: He was incarcerated at the Liberty County jail under the name of Eric James.
>
> Q: Did you ask him what his true name was?
>
> A: I had a name that I asked him if it was his and he stated no, his name was Eric James.

Defense counsel argued that SA Gabriel's testimony amounted to the introduction of evidence of other crimes or acts in contravention of the Federal Rules of Evidence.[3] The Government responded that SA Gabriel's testimony was offered only to show that he gave an alias.

Standing alone, this mention of incarceration is not prejudicial and does not rise to

---

**3.** F.R.E. 404(b) reads: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."

the level of an abuse of discretion. The witness did not say that Crenshaw had been jailed for charges unrelated to the sexual assault; in other words, there was no indication that the incarceration was related to any crime other than the one for which the defendant was being tried. When the defense objected to SA Gabriel's testimony, the trial judge reviewed the transcript and ruled that the most likely and reasonable interpretation of SA Gabriel's testimony was that when Crenshaw was first interviewed he was being held on suspicion of having raped Willis. This was not an unreasonable conclusion. Accordingly, we hold that failure to strike SA Gabriel's testimony was not reversible error.

### 3. *Admission of Photospreads*

■ At trial the Government introduced two photospreads of six photographs each, from which the complainant originally had identified each of the defendants as her assailants. Defense counsel objected and the Assistant United States Attorney responded that the Government was "entitled to show a prior identification by the victim where they've attacked her credibility." The court indicated that it would accept the photospreads for that purpose and agreed with the United States that identification was admissible as non-hearsay. The defense restated its objection after the pictures were identified and were admitted into evidence, and thus properly preserved the issue for appeal.

As we noted above, trial court rulings on the admissibility of evidence receive strong deference on appellate review and will be overturned only for an abuse of discretion. For the reasons discussed below, however, we conclude that admission of these photographs was an abuse of discretion.

The Government argues that the photospreads were relevant to its case because "identification is always an issue," and because the fact that the complainant went

through the effort of going to the police station and identifying the defendants was relevant to demonstrating her credibility. The Government also notes that a prior identification of a defendant from a photo is specifically admissible under the Federal Rules of Evidence, F.R.E. 801(d)(1)(C).

■ The Government's argument is flawed for several reasons. First, even though evidence is considered specifically admissible under the Federal Rules of Evidence, it still may be excluded if it is unfairly prejudicial to the defendant.[4] Although there is no binding precedent in this circuit, other circuits have considered the admissibility of photospreads and have applied very strict standards for how and when such evidence may be admitted. The reason is clear: Photospreads, or "mugshots" carry a clear implication of criminal activity that breaches the rule against admitting evidence of the defendant's bad character or previous brushes with the law. *See Barnes v. United States*, 365 F.2d 509, 510 (D.C.Cir.1966) (noting the prejudicial effect of mugshots), *United States v. Reed*, 376 F.2d 226, 228 n. 2 (7th Cir.1967), *cert. denied*, 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445 (1968) (same).

■ The Fifth Circuit recently dealt with this issue in *United States v. Torres–Flores*, 827 F.2d 1031 (5th Cir.1987), and applied the three-factor analysis first set forth by Judge Tuttle, sitting by designation, in *United States v. Fosher*, 568 F.2d 207 (1st Cir.1978). The *Torres–Flores* court held that unless the Government met the following standards, the introduction of mugshots would be reversible error:

1. The Government must have a demonstrable need to introduce the photographs; and
2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and
3. The manner of introduction at trial must be such that it does not draw

---

**4.** Under the rules of evidence, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." F.R.E. 403.

particular attention to the source or implications of the photographs.

*Torres–Flores*, 827 F.2d at 1037. We will apply this three-factor test to the facts of this case.

### 1. *Demonstrable Need for the Photographs*

The Government had no demonstrable need to introduce these photographs because the identity of the defendants was never at issue. From the opening statement, throughout trial testimony, and again during closing arguments, the defense made quite clear that they were relying on the issue of consent alone. The Government notes that at the initial police interview both Crenshaw and Hines originally denied knowing the complainant, and argues that the defendants relied on consent as a defense only because of the positive identification by the complainant. This argument carries no weight. The Government was free to bring up the defendants' changed story at trial—and did so—but identification of Crenshaw and Hines was never at issue once the trial began.

### 2. *Implication of Prior Criminal Record*

The Government seeks to characterize the photospreads as completely innocuous and unlikely to lead to any inference of criminal activity. The argument is belied by the pictures themselves:

*Photospread 1:*

—In five of the six photos, the men are holding what appear to be identification boards; on one of them (# 1), the words "Hinesville Police Dept." are clearly visible, and in another (# 3), the word "Hinesville" is fairly visible;

—Two of the men, including Crenshaw, are wearing identical orange uniforms that are clearly institutional garb;

—The photospread was presented to the jury in a folder marked in capital letters and bold print " 'MUG' SHOW–UP FOLDER."

*Photospread 2:*

—Although the words "Hinesville Police Dept." are not visible in any of these photos, it is clear that three of the men are holding identification boards;

—One of the men (# 1) is dressed in institutional garb;

—In four of the photos, including the one of Hines (# 3), there is a yardstick clearly visible in the background, which is obviously for noting the subject's height.

The Government argues that because the notation "Hinesville Police Dept." was not explicit on the photos of the defendants themselves, and that no prior offenses or other criminal identification numbers are present, there could be no inference of prior criminal activity. This analysis flies against basic common sense. The group of photos taken as a whole conveys an image of a collection from a "rogues' gallery" and at least five of the six photographs in each of the two photospreads—including those of the defendants—clearly indicate that the subjects were in law enforcement custody.

### 3. *Manner of Introduction*

SA Gabriel's testimony highlighted the fact that the photos were of known criminals and convicts, and heightened their prejudicial nature:

> Once we were at the Hinesville Police Department, Detective Reid and I went into their closed files and found a number of photographs generally meeting the descriptions of the individuals Ms. Willis described as her assailants.

> We then prepared two photo spreads of six photographs each. Each photograph spread consisted of six photos generally meeting the same characteristics and description of each subject—or suspect at that time individually. Therefore, there were two photo spreads, one relating to Mr. Hines and the other relating to Mr. James.

Furthermore, the court did not give the jury a cautionary instruction regarding the nature of these photographs and their limited evidentiary value, and did nothing to mitigate the effect of the introduction of the photospreads on the jury.

Although these may not be the worst variety of "mugshots"—the kind with profile and full-face views, serial numbers, and date of arrest—these photospreads clearly indicate to the jurors that the defendants were in police custody. Further, because appellants admitted having had intercourse with Willis but contended it was consensual, and Willis claimed it was forced, credibility of the witnesses was critical. Thus, the admission of the mugshots would have inflicted severe damage on defendants' credibility in an unfairly prejudicial way. We conclude that these photographs should not have been admitted, that their admission was not harmless error, and their inclusion requires reversal of the convictions.[5]

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the convictions and REMAND to the district court for a new trial.

---

**5.** We note that this is the second trial in this case. An earlier trial on these same charges ended in a mistrial on November 21, 1990 because the jury was unable to reach a verdict. This only underscores how close a case this is and highlights the fact that the use of mugshots could have unfairly tipped the scales against the defendants.