**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13123
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

CHRISTOPHER ASHLEY DEFILIPPIS,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cr-00342-SCB-TGW-1
_____

Before ROSENBAUM, ABUDU, and TJOFLAT, Circuit Judges.

ABUDU, Circuit Judge:

Christopher Defilippis appeals his convictions and sentence for distributing fentanyl that resulted in a person's death (Count One), and possession of fentanyl with the intent to distribute (Count Two). Defilippis was sentenced to life imprisonment on

Count One under 21 U.S.C. § 841(b)(1)(C), and ten years' imprisonment on Count Two.

After a thorough review of the record and the parties' briefs, we affirm.

## I. BACKGROUND

### A. Factual Background

Defilippis's criminal charges were related to the death of J.R.,[1] who died from a fentanyl overdose after purchasing some narcotics from Defilippis. J.R.'s girlfriend, Ashley Frohnapfel, provided most of the testimony central to the government's case, given that she was in the house with J.R. and discovered his dead body.

Between March and April 2020, J.R. messaged Defilippis multiple times over Facebook regarding the sale of drugs.[2] A few weeks before J.R.'s overdose, Frohnapfel saw Defilippis sell drugs to J.R. in an "old maroon four-door car." She testified that these drugs were packaged in foil rectangles.

According to Frohnapfel, on April 17, the day before J.R.'s overdose, she went to J.R.'s home around 8:00 p.m., and she drove him to a Chase Bank. Once they arrived at the bank, J.R. exited the

---

[1] In order to protect the identity of this victim, we refer to him by his initials throughout this opinion.

[2] Frohnapfel told investigators that J.R. would generally contact Defilippis through Facebook Messenger, so police obtained a search warrant for both of their Facebook records.

car while Frohnapfel waited inside. After about five minutes, J.R. returned to the car with what looked like Xanax and heroin wrapped in small aluminum foil rectangles. They drove back to J.R.'s home, and J.R. immediately went into the bathroom and shut the door. Minutes later, Frohnapfel found J.R. passed out on the bathroom floor next to the drugs he had just obtained. After she woke him up, the two started arguing over J.R.'s drug use, and Frohnapfel left to calm herself down. She returned to J.R.'s home about twenty minutes later.

When she returned, J.R. was in the living room watching YouTube videos and browsing Facebook. Frohnapfel went to bed at approximately 10 p.m., leaving J.R. alone in the living room. When she woke up around 1:30 a.m., J.R. was still watching television in the living room. Frohnapfel woke up again at 10:30 a.m., went to check on J.R., and found him in the living room kneeling over and not moving, with a needle, a spoon, and some foil next to him. Frohnapfel called 911 while attempting to revive J.R., but emergency dispatchers pronounced him dead on the scene. While investigating the scene, police officers collected the spoon, multiple syringes, and aluminum foil found near J.R.'s body.

During questioning, Frohnapfel told investigators that she believed J.R. bought the drugs that killed him from Defilippis, and she gave them Defilippis's telephone number. While J.R. would get drugs from several other people, including two of his brothers and a person known as "Old Man Joe," Frohnapfel did not believe they sold J.R. the drugs on April 17. Frohnapfel did not think that

J.R.'s brothers gave him the drugs that caused his overdose, given that one brother was in prison and the other was in a halfway house. As for "Old Man Joe," it had been at least a year before J.R.'s death since Frohnapfel had seen J.R. obtain drugs from him. Instead, given the proximity of Defilippis and J.R.'s last drug transaction and the similarity of the foil packaging, Frohnapfel believed J.R. got the drugs that killed him from Defilippis.

Based on the information Frohnapfel provided, a detective texted Defilippis's number while pretending to be J.R. to set up a drug buy at "the same spot by the bank." The texted number instructed the detective to meet him in forty-five minutes.

When officers arrived on the scene at the designated time, Defilippis was parked across the street from the bank in the same maroon vehicle. After a few minutes, Defilippis drove away. Officers followed his vehicle and conducted a traffic stop, ultimately removing Defilippis from the car and placing him under arrest. Following his arrest, police located the phone they had texted to set up the ruse, and a fanny pack Defilippis had been wearing, which contained $990 in cash and multiple clear plastic baggies containing powders and pills. The powders and pills were field tested and came back positive for cocaine, heroin, and Xanax. The officers were unable to conduct a field test for fentanyl, but eventual lab testing showed that some of the powder consisted of fentanyl and filler substances.

As part of the investigation, the police obtained surveillance video and transaction records from the evening J.R. went to Chase

Bank.  The video footage showed that Frohnapfel's car and Defilippis's maroon vehicle were at the bank at the same time.  Frohnapfel stated that she recognized the maroon four-door car as belonging to Defilippis when she reviewed the footage later.  Although no video captured Defilippis's face, the video contained footage of an arm with distinct tattoos using the ATM, and investigators matched the tattoos on the video to pictures of tattoos on Defilippis's arm taken while he was in pretrial custody.  In addition, the bank's transaction records showed that two ATM cash deposits were made into Defilippis's bank account around the same time that J.R. was present at the bank.

### B.  Procedural History

On November 17, 2020, a grand jury in the Middle District of Florida, Tampa Division, issued an indictment charging Defilippis with distribution of heroin and fentanyl resulting in death, and possession with intent to distribute fentanyl.    21 U.S.C. §§ 841(a)(1), 841(b)(1)(C).

On May 19, 2021, the district court held a status conference to discuss the upcoming trial, set for June 1, 2021.  Defense counsel requested more time to ensure Defilippis wanted to go to trial given the potential for a life sentence.  Defense counsel also wanted additional time to hire a toxicologist and to request discovery about the protocol the Florida Department of Law Enforcement used to test the drugs found on Defilippis at the time of his arrest.  The prosecutor agreed that a continuance would be ideal because the requested information could take two weeks to produce, meaning

defense counsel would not receive those materials until closer to trial.

The district court left the case on the trial calendar for June 1, but it agreed to issue a continuance if Defilippis was willing to waive his speedy trial rights. Defilippis chose not to waive those rights, so the trial went forward as scheduled on June 1.

Prior to trial, the government filed a notice of intent to introduce several pieces of evidence under Federal Rule of Evidence 404(b), including Facebook messages between Defilippis, J.R., and others involving the sale of drugs throughout March 2020 and April 2020. Defilippis filed a motion *in limine* to exclude his Facebook messages under Federal Rule of Evidence 403, as being "irrevocably prejudic[ial]," and Rule 404, because it was evidence of another crime used solely to show that he acted in accordance with that criminal character. The government opposed the motion, arguing the Facebook messages between Defilippis and J.R. showed the events leading up to the April 17 drug transaction and were, therefore, admissible as intrinsic evidence. Additionally, the government argued that Defilippis's messages with others were admissible under Rule 404(b) because the messages were evidence of Defilippis's intent to distribute drugs, which Defilippis contested.

During the trial, the district court held hearings to discuss the motion *in limine*. In the first hearing, the court ruled that the government could introduce Facebook messages between Defilippis and J.R. The court reasoned that the messages were intrinsic to the case, as opposed to extrinsic, because they were close enough

in time to help explain what happened between Defilippis and J.R., and they were admissible under Rule 404(b) as evidence of Defilippis's intent. At the second hearing, the district court admitted into evidence the messages between Defilippis and others as additional proof of Defilippis's intent to distribute drugs.

At trial, one of the investigating detectives testified about the Facebook messages between Defilippis and others. Prior to the introduction of this evidence, the court issued a limiting instruction informing the jury that they would hear evidence of Defilippis's alleged drug sales to other individuals, but they could only consider it to determine whether he intended to sell drugs to J.R.[3] The agent, after showing and describing the messages between Defilippis and others, testified that based on the messages, it was clear to him that Defilippis was selling them heroin and other opioids. Overall, the record evidence showed that, between March and April 2020, there were numerous messages between J.R. and Defilippis, multiple calls, requests from J.R. for drugs, and payments from J.R. to Defilippis. Importantly, the messages showed that, on

---

[3] The exact wording cautioned the jury that it "must not consider this evidence—that is, the communications between the Defendant and T.M., L.E., and J.D.—to decide if the Defendant engaged in activity alleged in the indictment, but you may consider it for the following reasons: To determine whether the Defendant had the state of mind or intent necessary to commit the crime that is charged in the indictment; to consider whether the Defendant had a motive or an opportunity to commit the acts charged in the indictment; as to whether the Defendant acted according to a plan; or finally whether the Defendant committed the acts charged in the indictment by accident or mistake."

April 17, 2020, J.R. called Defilippis, Defilippis proposed a meet-up location, and the surveillance video showed that Defilippis's car arrived around six minutes later.

Another piece of evidence upon which the government based its case against Defilippis was the tattoo on the arm of the person captured on the bank's video footage. The government maintained that the tattoo was further evidence of Defilippis's presence at the bank given that the tattoo matched photographs of the tattoo on Defilippis's arm taken while he was in pretrial detention. Defense counsel objected to the admission of the photographs taken while he was in custody, arguing that the jurors seeing him in a jail jumpsuit would be unduly prejudicial. Defense counsel also suggested Defilippis could simply show his tattoo to the jury during the trial, and offered to let Defilippis show his arm to the jury. The district court overruled the objection, stating, "It's hard to tell he's in a jail uniform. Looks like a shirt." Additionally, the court reasoned that the jury "can take [the photographs] back [into the jury room]. They can't take his arm back."

Later, the government called Dr. Julia Pearson, the chief forensic toxicologist with the Hillsborough County Medical Examiner Department, to testify as an expert witness. The police department had asked Pearson to test the substances found near J.R.'s body and those confiscated during Defilippis's arrest. Pearson testified about three pills and two foil packets found near J.R.'s body. According to Pearson, the pills tested positive for Alprazolam, which is commonly known as Xanax. The first foil packet tested

positive for 4-ANPP,[4] quinine,[5] and fentanyl. The most common substance present in the first foil packet was fentanyl, followed by quinine, and trace amounts of 4-ANPP. The second foil packet tested positive for the same substances, but unlike the first foil, this one contained more quinine than fentanyl. Pearson testified that it is possible that something that first appeared to be heroin would test positive for fentanyl because they look similar to one another.

Pearson also tested three baggies (marked A, B, and C) confiscated during Defilippis's arrest. Baggy A tested positive for fentanyl, quinine, and 4-ANPP. The most common substance found in baggy A was fentanyl, followed by quinine, and trace amounts of 4-ANPP. Baggy B tested positive for fentanyl, quinine, 4-ANPP, caffeine, lidocaine, and Tramadol. Pearson believed baggy C "look[ed] like baggy A" because it tested positive for the same three substances as baggy A: fentanyl, quinine, and 4-ANPP. The chemical ratios in baggies A and C were similar to those in the first foil packet found near J.R.'s body.

Defense counsel questioned Pearson about whether quinine was found in J.R.'s blood. Pearson testified that there typically must be a significant concentration of quinine present in the controlled substance to show up in a decedent's blood. Given the high proportion of quinine in the foils, Pearson went back and examined

---

[4] Pearson testified that 4-ANPP is a substance used to manufacture fentanyl.

[5] Pearson testified that quinine is commonly used as a cutting agent when manufacturing controlled substances.

J.R.'s blood test out of "intellectual curiosity" to see if there was quinine present. There was a "trace amount of quinine," but the amount was not "significant enough" for the lab to "call it as being present." Specifically, the amount detected was "too small and too weak" to be called present, and it "was not a very good library match" to quinine. Therefore, while she discovered a "trace" amount, it was too small to be called present in the report, and she was unable to testify with a reasonable degree of medical certainty that quinine was in the decedent's blood.

Defilippis's primary defense theory was that J.R. died from drugs that Defilippis did not supply to him. The defense called William Kim, a crime laboratory analyst in the Florida Department of Law Enforcement, to testify. Kim tested baggie A from Defilippis's fanny pack and a cotton swab a detective took from the syringe found next to J.R.'s body. According to Kim's report on baggy A, it tested positive for fentanyl. Kim did not test for or identify quinine or 4-ANPP in the baggie, he said, because he was only asked to identify controlled substances and not filler substances. Therefore, Kim only listed fentanyl as present in baggy A.

During cross-examination, the government questioned Kim about the test he performed on the cotton swab taken from the syringe found next to J.R. Defense counsel objected to the question, arguing that the prosecution did not disclose the swab test report during discovery, so it was improper for Kim to testify about testing the cotton swab. The court overruled the objection, reasoning that Kim was the defense's witness, and the defense should

know what Kim could present if he called the witness. Kim then testified that he did not identify any controlled substances on the swab.

After deliberations, a unanimous jury found Defilippis guilty on both counts. During the sentencing hearing, Defilippis's attorney raised, among other arguments, that a possible life sentence would violate the Eighth Amendment's prohibition against cruel and unusual punishment and his due process rights. The district court overruled the objections and sentenced Defilippis to life imprisonment on Count One and ten years' imprisonment on Count Two.

Soon thereafter, Defilippis moved for a new trial. He argued that: (1) the trial court erred in denying his motion *in limine* to exclude evidence of uncharged, alleged drug transactions; (2) the government failed to meet its burden proving that the fentanyl that led to J.R.'s overdose was attributable to Defilippis; (3) the government's closing arguments misrepresented the scientific evidence; and (4) the government committed a *Brady* violation by failing to timely disclose reports and important information from witnesses.

The district court denied Defilippis's motion. The court determined that the Facebook messages were properly admitted, especially given the court's limiting instruction to the jury, and that there was sufficient scientific and record evidence to support the jury's verdict. It further held that the government had not violated any discovery rules and noted Defilippis's own refusal to reschedule the trial date to account for any reasonable delay in the

government's disclosures.  The court also rejected Defilippis's argument about any disadvantage of having Kim testify about the cotton swab, reasoning that such evidence was available to both sides and Defilippis was on notice regarding that potential line of questioning.

After the court denied his motion for a new trial, Defilippis filed the instant appeal.

## II. STANDARDS OF REVIEW

On appeal, Defilippis challenges the district court's evidentiary rulings, the sufficiency of evidence against him, the denial of his motion for a new trial, and the application of a mandatory life sentence.

We review a district court's evidentiary rulings for abuse of discretion.  *United States v. Ahmed*, 73 F.4th 1363, 1373 (11th Cir. 2023).  If the district court's evidentiary ruling was an abuse of discretion, then we must determine whether the error was harmless. *Id.* at 1380.  A harmless error does not have "a substantial influence on the outcome of the case" or cast "grave doubt" that the jury would have changed its verdict had the evidence not been introduced.  *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) (internal citations omitted).

We review the sufficiency of the evidence against Defilippis *de novo*.  *United States v. McCrimmon*, 362 F.3d 725, 728 (11th Cir. 2004).  In doing so, we view "the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in the government's favor to determine whether a

rational jury could have found the defendant guilty beyond a reasonable doubt." *Id.* "The verdict must stand 'unless no trier of fact could have found guilt beyond a reasonable doubt.'" *Id.* (alteration adopted) (quoting *United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997)). A jury is "free to choose among reasonable constructions of the evidence" and "[t]he government need not disprove every hypothesis of innocence . . . ." *United States v. Suba*, 132 F.3d 662, 671–72 (11th Cir. 1998).

We review "a district court's denial of a motion for a new trial based on a *Brady* violation . . . for abuse of discretion." *United States v. Vallejo*, 297 F.3d 1154, 1163 (11th Cir. 2002); *see also United States v. Elbeblawy*, 899 F.3d 925, 933 (11th Cirt. 2018) ("'We review *de novo* alleged *Brady* violations,' and we review 'the district court's denial of a motion for a new trial for an abuse of discretion.'" (alterations adopted) (quoting *United States v. Stein*, 846 F.3d 1135, 1145 (11th Cir. 2017))). We also review a denial of a motion for a new trial pursuant to Federal Rule of Criminal Procedure 16, relating to the government's discovery obligations, for abuse of discretion. *United States v. Stahlman*, 934 F.3d 1199, 1229 n.16 (11th Cir. 2019).

Lastly, we review *de novo* issues of statutory interpretation and challenges to the constitutionality of a statute. *See United States v. Anaya Castro*, 455 F.3d 1249, 1251 (11th Cir. 2006). However, where a defendant fails to preserve an objection in the district court, we review the challenge only for plain error. *United States v. Carpenter*, 803 F.3d 1224, 1237 (11th Cir. 2015).

## III. DISCUSSION

Defilippis raises several issues on appeal but, for the reasons set forth below, we reject his arguments and affirm his convictions and sentence.

### A. *Evidence of Prior Drug Activity*

Defilippis argues the district court abused its discretion in admitting evidence concerning his prior drug-related activity. In general, extrinsic evidence of a defendant's prior crimes, wrongs, or other bad acts is not admissible to prove his character and show that he acted in accordance with that character on a particular occasion. FED. R. EVID. 404(b)(1). However, this evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). To determine whether extrinsic evidence of prior bad acts is admissible, we use a three-part test: "(1) the evidence must be relevant to an issue other than defendant's character; (2) the probative value must not be substantially outweighed by its undue prejudice; [and] (3) the government must offer sufficient proof so that the jury could find that defendant committed the act." *United States v. Ellisor,* 522 F.3d 1255, 1267 (11th Cir. 2008) (quoting *United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005)). Intrinsic evidence, on the other hand, is evidence that is: "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined

with the evidence regarding the charged offense." *Id.* at 1269 (quoting *United States v. Jimenez*, 224 F.3d 1243, 1249 (11th Cir. 2000)).

We agree with the district court that the Facebook messages between Defilippis and other people were admissible as extrinsic evidence. The government sought to prove Defilippis's intent to distribute drugs, something which he contested. Thus, whether he had the necessary intent was "automatically placed . . . in issue." *United States v. Jones*, 913 F.2d 1552, 1566 (11th Cir. 1990). Evidence of a defendant's prior similar distribution is relevant to their intent. *Id.*; *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1224 (11th Cir. 1993). Here, the Facebook messages were directly probative of whether Defilippis intended to distribute the drugs which resulted in J.R.'s death.

Furthermore, the court instructed the jury they could consider the communications between Defilippis and others solely for the limited purpose of deciding whether he had the intent to sell drugs to J.R. *See Diaz-Lizaraza*, 981 F.2d at 1225 ("While the probative value and government need for this evidence were strong, any unfair prejudice possibly caused by its introduction was mitigated by the trial judge's limiting instructions.").

Moreover, there was sufficient proof for the jury to conclude that Defilippis had the intent to distribute drugs, as alleged. The Facebook account was linked to Defilippis, the messages contained numerous requests for drugs in exchange for money, and they showed responses from Defilippis that indicated he had agreed to make those sales and meet the buyers. In one group of messages,

a person confirmed they had received drugs from Defilippis, commented on the quality of the drugs, and asked for more. Based on the frequency of those messages and their contents, the government submitted sufficient proof for a jury to find that these messages related to Defilippis's drug transactions.

In sum, the district court did not abuse its discretion in admitting the Facebook messages between Defilippis and others as extrinsic evidence relevant to his knowledge and intent to distribute drugs.

### B. Tattoo Photos

Next, Defilippis contends that the district court abused its discretion in allowing the jury to view photographs of him while wearing an orange jail uniform as evidence of whether his arm tattoo matched the one in the bank's video surveillance. Defendants have a constitutional right to be tried without wearing a jail uniform. *See Estelle v. Williams*, 425 U.S. 501, 512 (1976). Similarly, we have questioned the propriety of admitting photospreads and booking photos, or mug shots, into evidence, given their clear potential for undue prejudice. *See United States v. Hines*, 955 F.2d 1449, 1455 (11th Cir. 1992); *United States v. Clotaire*, 963 F.3d 1288, 1299 (11th Cir. 2020). One primary concern is that the photographs directly or strongly imply a defendant has been engaged in criminal activity and unfairly suggest bad character or a history of arrests or convictions, especially when a court should otherwise exclude any

evidence that would invite those jury assumptions or character conclusions. *Hines*, 955 F.2d at 1455; *Clotaire*, 963 F.3d at 1299.[6]

To admit these photographs, the government must have a "demonstrable need to introduce the photographs." *Clotaire*, 963 F.3d at 1299 (quoting *Hines*, 955 F.2d at 1455). Second, the "photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record." *Id.* (quoting *Hines*, 955 F.2d at 1455). Third, the "manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs." *Id.* (quoting *Hines*, 955 F.2d at 1455–56).

The issue here is whether the pictures of Defilippis in an orange jail uniform unfairly prejudiced him before the jury. We find that the district court abused its discretion in admitting the three photographs, but that their admission was harmless. For sure, being photographed in a jumpsuit which was very visible from the photos taken at various angles did "weaken [Defilippis's] presumption of innocence by stigmatizing him with 'an unmistakable badge of criminality.'" *Id.* at 1301 (quoting *Eberhardt v. Bordenkircher*, 605 F.2d 275, 280 (6th Cir. 1979)). One photograph depicts Defilippis in an orange shirt with a white badge clipped to his shirt and a medical mask. Another photograph shows the bottom half of Defilippis's body, revealing him clothed in a distinctive orange two-

---

[6] Because the potential prejudicial effect of admitting the three photographs of Defilippis in prison garb here mirrors the concerns outlined in admitting mug shots, we employ the same analysis.

piece set and wearing orange rubber slides. The final picture is zoomed in from the back, showing his elbow and a portion of his orange shirt.

As we have held in other contexts, "[c]learly identifiable prison garb does more than clothe a defendant with suitable raiment—it also clothes him with an unmistakable mark of guilt." *United States v. Harris*, 703 F.2d 508, 512 (11th Cir. 1983). These photos necessarily implied a criminal record. This, paired with the simple alternative of retaking the photographs or showing the jury Defilippis's arm, which he offered to do, demonstrates that the district court abused its discretion in admitting them.

However, the admission was harmless. In making this determination, we inquire whether the evidence's admission had a "substantial influence" on, or "left grave doubt" as to whether it impacted, the case's outcome. *Henderson*, 409 F.3d at 1300 (alteration adopted) (quoting *United States v. Frazier*, 387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (*en banc*)). In Defilippis's case, we have no grave doubt that the verdict would have been different had the photos not been introduced. Here, the government also introduced evidence of Defilippis's prior felony drug convictions, including a mug shot from those convictions, so the jury had already seen him in an orange prison jumpsuit, knew that he had been in jail previously, and understood that he had a criminal past. Thus, admitting these photos of Defilippis in the jail uniform to show his tattoos, while an abuse of discretion, was nevertheless harmless to the ultimate outcome at trial.

### C. J.R.'s Death and the Causation Standard

Defilippis next asserts that the government did not present sufficient evidence to prove that the drugs he distributed were the but-for cause of J.R.'s death. He asserts that the drugs that led to the overdose could have come from another drug supplier, and that no one can definitely state where J.R. was or went in the hours leading up to his death.

The question is whether J.R.'s death "result[ed] from" the use of the controlled substances he received from Defilippis, 21 U.S.C. § 841(b)(1)(C), which the Supreme Court has interpreted to require a showing of but-for causation. *Burrage v. United States*, 571 U.S. 204, 214–16 (2014); *see United States v. Feldman*, 936 F.3d 1288, 1310 (11th Cir. 2019) ("*Burrage* . . . neither requires proof that a Schedule I or II drug 'alone' caused a victim's death nor precludes application of § 841(b)(1)(C)'s mandatory minimum sentence in mixed-drug intoxication cases. Instead, *Burrage* held only that, 'where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant can not be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury.'" (emphasis omitted) (quoting *Burrage*, 571 U.S. at 218–19)). This is the "common understanding of cause" and typically applies when a statute—like Section 841(b)(1)(C)—uses "results from." *Burrage*, 571 U.S. at 211–12. "But-for causation" describes harm that would not have occurred absent the conduct at issue. *Id.* at 211.

If there is no causal link between the alleged conduct and the harm, then there is no but-for causation.  However, there is but-for causation, even if there is a time lag between the conduct and the result, when the "event is the outcome or consequence of another when the former would not have occurred but for the latter." *Id.* at 212.  This is true even when there are multiple "but-for" causes, so long as the analyzed cause was necessary to bring about the result. *Id.*

Based on the evidence construed in the government's favor, we hold that a trier of fact could have reasonably found that Defilippis's drugs were the but-for cause of J.R.'s death.  The evidence established that Defilippis was the most likely distributor. Frohnapfel testified as to why she did not believe any of J.R.'s other known drug dealers were responsible, and she had seen Defilippis sell drugs to J.R. within a month of J.R.'s overdose.  The government also presented evidence of J.R. and Defilippis's prior drug transactions and communication on April 17, the day before the overdose.  Further, Frohnapfel testified that Defilippis dealt drugs wrapped in foil on prior occasions, which resembled the packages J.R. received when he went to the bank, and the drugs in J.R.'s foil pouches were chemically similar to the baggies found on Defilippis at the time of his arrest.

The timing of J.R.'s meeting with Defilippis and his drug overdose also line up with a reasonable conclusion that he used the drugs he got from Defilippis that evening and then died not long thereafter.  Pearson testified that the makeup of one of the foil

pouches found close to J.R. was similar in chemical makeup to baggies A and C Defilippis was carrying at the time of his arrest.  Taken together, a jury reasonably could find that Defilippis sold J.R. drugs at the bank, J.R. stayed home all night and took those drugs, and then he overdosed from those same drugs given the drug paraphernalia and other evidence found near him.  These circumstances support a jury finding that Defilippis was the "but-for" cause of J.R.'s death.  *See United States v. Iriele*, 977 F.3d 1155, 1168 (11th Cir. 2020) ("[A] jury is free to choose among the reasonable constructions of the evidence." (quoting *United States v. Godwin*, 765 F.3d 1306, 1320 (11th Cir. 2014))).  Accordingly, we affirm on this issue.

### D.  Motion for a New Trial

Defilippis also maintains the government violated *Brady*[7] and Federal Rule of Criminal Procedure 16 by failing to timely disclose: (1) Pearson's findings regarding the composition of substances found next to J.R. when he died as compared to those in Defilippis's possession when he was arrested; (2) that there were traces of quinine in J.R.'s blood; and (3) evidence that Kim tested the cotton swab from the syringe.  We will not reverse a conviction based on a discovery violation of Rule 16 unless the violation prejudiced the defendant's substantial rights.  *Stahlman*, 934 F.3d at 1230.  In particular, to receive a new trial because of newly discovered evidence, the defendant must demonstrate that "(1) the evidence was discovered after trial; (2) his failure to discover the

---

[7] *Brady v. Maryland*, 373 U.S. 83, 84 (1963).

evidence was not due to a lack of diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that a new trial would probably produce a different result." *Id.* (citing *United States v. Barsoum*, 763 F.3d 1321, 1341 (11th Cir. 2014)).

As an initial matter, Defilippis is relying on a version of Rule 16 which has been revised since his trial. Prior to its 2022 amendments, Rule 16 required the government, upon the defendant's request, to proffer a written summary of any testimony that it intended to use under Federal Rules of Evidence 702, 703, or 705. FED. R. CRIM. P. 16(a)(1)(G) (2021).[8] Thus, "[i]f the government intend[ed] to present a witness as an expert in a criminal trial, the government must [have] disclose[d] that witness as an expert prior to trial and provide[d] a written summary of the expected testimony." *Stahlman*, 934 F.3d at 1219.

Under *Brady*, prosecutors must disclose exculpatory, material evidence to the defense, and their failure to do so results in a violation of the defendant's due process rights. *See Brady*, 373 U.S. at 87. To establish a *Brady* violation, a defendant must demonstrate that "(1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable

---

[8] Rule 16(a)(12)(G) was amended in 2022. *See* FED. R. CRIM. P. 16, Advisory Comm. Notes to 2022 Amend.

probability that the outcome would have been different." *Vallejo*, 297 F.3d at 1164 (citing *United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989)). We find that Defilippis has failed to establish a violation of Rule 16 or *Brady* and, therefore, was not entitled to a new trial.

First, Defilippis was aware beforehand that the government might take additional time, reasonable under the circumstances, to produce some of the discoverable documents. Second, the key elements of a *Brady* violation—suppression of evidence that could be exculpatory—are not present here. Pearson submitted her toxicology report on May 25, 2021, and the defense received it two days later. So, the report was not suppressed. *See United States v. Brester*, 786 F.3d 1335, 1339 (11th Cir. 2015) (holding a defendant must "prove that the prosecution withheld favorable evidence" to establish a *Brady* violation). Defilippis also could have moved for a continuance after receiving the report if indeed the timing was too short for a thorough review, but he did not do that either. Therefore, the court did not abuse its discretion in denying his request for a new trial on this basis.

Defilippis contends he also was blindsided by Pearson's testimony on the amount of quinine in J.R.'s blood, which was not mentioned in her report. At trial, the government questioned Pearson about the substances found near J.R.'s body and confiscated from Defilippis when he was arrested. The government did not ask Pearson about the substances found in J.R.'s blood; it was defense counsel who raised that issue for the first time. Therefore,

Defilippis cannot successfully argue that the government violated Rule 16 based on testimony that Defilippis's counsel elicited. *See* FED. R. CRIM. P. 16(a)(1)(G) (2021) (requiring disclosure of "any testimony that *the government intends to use* at trial" (emphasis added)). In addition, the evidence regarding the substances found in J.R.'s body was not exculpatory, but instead more damaging to Defilippis's defense. *Vallejo*, 297 F.3d at 1164 (citing *Meros*, 866 F.2d at 1308). The testing actually further suggested that J.R. overdosed on a substance chemically similar to the substances that Defilippis had in his possession at the time of his arrest.

In any event, Pearson did not perform J.R.'s blood test, and she made that clear in her testimony. Instead, she reviewed his blood out of "intellectual curiosity," which is why she was aware of the results. She did not author a report identifying the presence of quinine in J.R.'s blood, both because she did not test his blood and because the amount was too small to say with a degree of medical certainty that the blood actually contained quinine. In fact, she clarified that there was a substance in his blood that "could be" quinine, but it was "not a very good" match because it was "too small and too weak" for them to call. Overall, the district court did not abuse its discretion in declining to grant a new trial based on the testimony Pearson provided with Defilippis's prompting.

Finally, as to the government's cross-examination of Kim, Defilippis contends the government never notified him of its plan to have Kim testify as to his testing of the cotton swab taken from the syringe which was next to J.R. The district court determined

that, because Kim was Defilippis's witness, the defense should have asked him about the universe of testing and evidence he possessed that might be relevant and raised during the trial.  Indeed, "[t]he government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself."  *Stein*, 846 F.3d at 1146 (quoting *United States v. Valera*, 845 F.2d 923, 928 (11th Cir. 1988)).  Instead, a defendant establishes a Rule 16 violation when his failure to discover the evidence was not due to a lack of diligence. *See Stahlman*, 934 F.3d at 1230.  *Brady* and Rule 16 protect defendants from the undue surprise of having evidence introduced that they had no way of discovering, not against evidence they can obtain themselves. Here, the district court reasonably concluded that defense counsel had all the information it needed to prepare for Kim's testimony, especially given that Kim was the defense's witness.

In any event, Kim's testimony about the cotton swab did not affect the jury's guilty verdict.  Kim testified that there was nothing identifiable on the cotton swab that could either help or hurt Defilippis's case.  Importantly, there was other very strong evidence linking Defilippis to the drugs that caused J.R.'s overdose.  Therefore, taken as a whole, the district court did not abuse its discretion in denying Defilippis's motion for a new trial.

### E.  Application of 21 U.S.C. § 841(b)(1)(C)

Finally, Defilippis argues that the district court erred in imposing a mandatory life sentence under Section 841(b)(1)(C) because the sentencing provision is inconsistent with legislative

intent and violates his equal protection rights. Because Defilippis failed to raise this issue below,[9] we review this argument for plain error. *Carpenter*, 803 F.3d at 1237. Plain error occurs when there is an "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Utsick*, 45 F.4th 1325, 1332 (11th Cir. 2022). The error is not plain when the language of a statute or rule fails to resolve the issue at hand. *United States v. Frank*, 599 F.3d 1221, 1239

---

[9] To preserve an objection, a defendant "must raise that point in such clear and simple language that the trial court may not misunderstand it." *United States v. Ramirez-Flores*, 743 F.3d 816, 821 (11th Cir. 2014) (citation and quotation marks omitted). A defendant does not preserve an issue for appeal if the objection's factual predicates were raised but were presented to the district court under a different legal theory. *Id*. Here, Defilippis did not preserve the legislative intent and equal protection arguments he raises on appeal.

To the extent he argues that he adequately raised his equal protection argument through the mention of due process, he did not raise it with enough specificity to preserve the objection he raises on appeal. *United States v. Zinn*, 321 F.3d 1084, 1088 (11th Cir. 2003). In his sentencing memorandum, Defilippis raised due process only once, which was a bare request that the court declare that the mandatory minimum was "a violation of the Due Process Clause" and strike its application. At the sentencing hearing, Defilippis's entire statement regarding due process was, "I also would argue it's a due process clause violation, that I think at this point I'm just preserving that." These bare-bone mentions of "due process" are insufficient to preserve a due process and equal protection-based rational basis challenge to Section 841(b)(1)(C). He did not mention either prong of the rational basis test or construct any arguments that the statute did not have a legitimate purpose or that it was unreasonable for the statute to further that purpose. The bare invocation of due process, without any argument or additional mention, is insufficient to preserve a fleshed-out equal protection argument on appeal. *See id*. at 1090 n.7 ("[T]he district court is not expected to read minds or independently conceive of every possible argument a party might raise in support of an objection.").

(11th Cir. 2010).  If a defendant establishes these prerequisites, we then determine if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Utsick*, 45 F.4th at 1332.

The district court's application of Section 841(b)(1)(C) was not plainly erroneous.  The baseline penalties for selling a "controlled substance" without authorization are set forth in 21 U.S.C. § 841(b)(1)(C).  Charges for specific quantities of drugs are set forth in Sections 841(b)(1)(A)–(B), which authorize, and sometimes require, higher penalties.  *United States v. Files*, 63 F.4th 920, 921–22 (11th Cir. 2023).  One circumstance in which Sections 841(b)(1)(A)-(C) require higher penalties is when the distributed substance results in death or substantial bodily harm to a user and when the defendant has certain predicate convictions.      21 U.S.C. § 841(b)(1)(A)-(C).  The First Step Act of 2018 amended Sections 841(b)(1)(A)–(B), restricting the types of crimes that qualify as a prior conviction for a sentencing enhancement to a "serious drug felony" or a "serious violent felony."  "Serious drug felony" is defined as an offense for which an individual actually served a term of imprisonment of more than 12 months.  *Id.* § 802(58).  The First Step Act did not change the language of Section 841(b)(1)(C), which enhances penalties following "felony drug offense[s]."  "Felony drug offense[s]" includes offenses punishable by a term of imprisonment for more than one year.  *Id.* § 802(44).

The language of Section 841(b)(1)(C) is explicit and unambiguous about which offenses trigger mandatory life sentences.

While its prerequisites for life imprisonment differ compared to the preceding two sections, that decision is within Congress's discretion. "Congress has the power to define criminal punishments without giving the courts any sentencing discretion." *Chapman v. United States*, 500 U.S. 453, 467 (1991); *United States v. Clark*, 274 F.3d 1325, 1328 (11th Cir. 2001) (holding that a district court has no discretion to depart downward from a mandatory minimum sentence established by Congress). Thus, the district court did not plainly err in imposing a mandatory life sentence.

Defilippis's equal protection argument fares no better. We apply rational basis review because Defilippis has not alleged nor shown a discriminatory intent on the part of Congress. *United States v. King*, 972 F.2d 1259, 1260 (11th Cir. 1992); *United States v. Solomon*, 848 F.2d 156, 157 (11th Cir. 1988) ("Heightened scrutiny is inapplicable because the statute does not discriminate on the basis of a suspect classification or the exercise of a fundamental right."). "To pass the rational basis test, the legislation must have a legitimate purpose, and it must have been reasonable for lawmakers to believe that the use of the challenged classification would promote that purpose." *King*, 972 F.2d at 1260. This is a very lenient standard. *See TRM, Inc. v. United States*, 52 F.3d 941, 946 (11th Cir. 1995) ("Even if the court is convinced that the political branch has made an improvident, ill-advised or unnecessary decision, it must uphold the act if it bears a rational relation to a legitimate governmental purpose." (quoting *Cash Inn of Dade, Inc. v. Metro. Dade Cnty.*, 938 F.2d 1239, 1241 (11th Cir. 1991))). "Under rational basis review, we apply a strong presumption of validity." *United*

*States v. Castillo*, 899 F.3d 1208, 1213 (11th Cir. 2018) (citation and internal quotation marks omitted).

No Eleventh Circuit or Supreme Court precedent addresses whether the imposition of a life sentence pursuant to 21 U.S.C. § 841(b)(1)(C) violates equal protection under the Fifth Amendment because the passage of the First Step Act allegedly unevenly amended portions of 21 U.S.C. § 841(b)(1). *See Frank*, 599 F.3d at 1239. Indeed, we have upheld sentences imposed pursuant to Section 841(b)(1)(C) since the 2018 amendment went into effect. *See, e.g.*, *United States v. Benjamin*, 958 F.3d 1124, 1128 (11th Cir. 2020). For those reasons, the district court did not plainly err in imposing a life sentence under the statute.

## IV. CONCLUSION

For the reasons we have explained, we affirm Defilippis's convictions and sentence.

**AFFIRMED.**